851 F.Supp. 660 (1994)
COTTMAN TRANSMISSION SYSTEMS, INC.
v.
Donna MELODY and Lee W. Melody.
Civ. A. No. 94-2038.
United States District Court, E.D. Pennsylvania.
April 22, 1994.
*661 Todd P. Leff, Cottman Transmission Systems, Inc., Fort Washington, PA, for plaintiff.
Craig R. Tractenberg, Abraham, Pressman & Bauer, P.C., Philadelphia, PA, for defendants.

DECISION
JOYNER, District Judge.
This civil action comes before this Court following removal from the Court of Common Pleas of Montgomery County, Pennsylvania and upon motion of the plaintiff, Cottman Transmission Systems, Inc. for the issuance of a preliminary injunction enjoining the defendants, Lee and Donna Melody from, inter alia, infringing upon Cottman's trademarks, manuals, proprietary information and to enjoin Mr. and Mrs. Melody from operating a competing transmission business in La Habra, California. Plaintiff also moves to hold the said defendants in contempt of the temporary restraining order issued by the Montgomery County Court prior to removal. Hearings in this matter were held on April 6, 7 and 11, 1994 and the respective motions were orally argued on April 12, 1994. Pursuant to Fed.R.Civ.P. Nos. 52 and 65, we now make the following:

*662 FINDINGS OF FACT

1. Plaintiff, Cottman Transmission Systems, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 240 New York Drive, Fort Washington, Pennsylvania.
2. Defendants Lee W. Melody and Donna Melody are adult individuals, husband and wife, who owned and operated the Cottman Transmission Center located at 441 E. Imperial Highway in La Habra, California. Defendants reside at 311 16th Street in Seal Beach, California.
3. Cottman Transmission Systems, Inc. (hereinafter "Cottman") was organized in 1962 and since that time and to the present has, as its principal business purpose, the licensing and operation of automobile transmission repair centers throughout the United States. Cottman achieves its business purpose through the sale of franchises and/or licenses to operate Cottman Transmission Centers to individual franchisee/licensees. At present, Cottman has 140 franchises/transmission centers throughout the United States, five of which are located in California.
4. Cottman owns, as federally registered trademarks, the Cottman logo, the phrase "Cottman Man," and the actual Cottman Man Figure. Pursuant to its Licensing Agreements, Cottman permits its licensee/franchisees to, among other things, utilize the Cottman name and its trademarks, trade names, service marks and logos. These marks, names and logos appear on the stationery, business cards, signs, repair orders and promotional items and on the advertising which Cottman supplies to and procures for its licensees in accordance with the terms and conditions of its license agreements.
5. The sales of franchises to franchisees is regulated by the Federal Trade Commission. The Federal Trade Commission requires all franchisors to send to potential franchisees an informational document known as a Uniform Franchise Offering Circular for their review prior to entering into negotiations for the sale of a franchise. Cottman must renew and update its offering circulars every year and, in addition, must comply with the particular requirements of the laws of each state in which it is authorized to sell franchises. Presently, Cottman is authorized to sell franchises in ten states, including California.
6. A Cottman franchise essentially consists of what is referred to in its licensing agreements as the "Cottman System" for conducting operations in the automotive transmission business. The system consists, in part, of the use of the Cottman name, Cottman's methods, procedures and techniques, and a network of Centers devoted exclusively to the repair of automotive transmissions using the Cottman name, methods, procedures and techniques.
7. The initial License Fee to purchase a license to operate a Cottman franchise is, and at all times relevant to this case, was $22,500.00. A prospective licensee could purchase either a new license directly from Cottman or an existing license from a Cottman licensee subject, of course, to Cottman's approval of the sale.
8. Under the Franchise Investment Law of the State of California, franchises must be registered with the California state Department of Corporations. It is in compliance with this law that Cottman submitted its application for renewal of its offering circular to the Department of Corporations on or about February 3, 1993 and that the application for registration was approved, effective as of March 9, 1993. Notwithstanding the state's acceptance of the updated circular and the registration renewal, page two of Cottman's Uniform Franchise Offering Circular specifically states that "such registration does not constitute approval, recommendation or endorsement by the Commissioner of Corporations nor a finding by the Commissioner that the information provided herein is true, complete and not misleading."
9. In or about February, 1993, Lee Melody left his position as President and CEO of the Mc Guire Nicholas Corporation with one year's severance pay and, together with his wife Donna began exploring various franchise opportunities with an eye toward opening and running his own business. Although *663 Lee Melody had more than twenty years' experience in the corporate business world primarily in the areas of sales, marketing and management, he had no experience in retail, in owning or operating a small business or in the automotive or automotive/transmission repair industry.
10. In early March, 1993, Mr. Melody answered an advertisement from a franchise broker in California with the result that he received a letter on Cottman stationary dated March 15, 1993 from one Joseph Sanfellipo, the sole owner of Franchiseworks, Inc. of Del Mar, California. In that letter, Mr. Sanfellipo described himself as someone with over twenty years of experience in starting and growing businesses and went on to tout the benefits of owning a Cottman franchise. Mr. Melody and Mr. Sanfellipo subsequently met on March 18, 1993 at the Cottman in Escondito, California to further discuss franchise opportunities with Cottman.
11. On March 22, 1993, Mr. Sanfellipo gave Mr. Melody a copy of Cottman's Uniform Franchise Offering Circular to review and it was at or about this same time that Mr. Melody executed a receipt acknowledging that he had received a copy of the offering circular and that he completed a Cottman Franchise Questionnaire for submission to the Cottman home office along with a copy of his then-current resume.
12. Joseph Sanfellipo and Franchiseworks, Inc. are described at page 6 of the Offering Circular as "a Franchise Sales Agent for Cottman Transmissions Systems, Inc. Mr. Sanfellipo is the President of that company [Franchiseworks] and the sole owner." At the time of their meeting, Mr. Sanfellipo told Mr. Melody that he had spent a considerable amount of time working with Cottman and that he had become the sole agent for Cottman in Southern California.
13. The Uniform Franchise Offering Circular also included a copy of the Cottman License Agreement together with, inter alia, the Cottman License Schedule, Telephone Waiver, Sign Lease Agreement, Lease Rider and Manual Receipt and a listing of the names, addresses and telephone numbers of existing Cottman franchisees nationwide.
14. In the course of his review of the offering circular, Mr. Melody called and spoke with Michael Ambrose, the President of Cottman as well as several of the franchisees listed in the circular.
15. In late March or early April, 1993, Mr. Melody decided that he would like to proceed with the purchase of a Cottman franchise and in accordance with that decision, he met with and gave Mr. Sanfellipo a check in the amount of $22,500 representing payment in full for a Cottman License. Receipt of this payment was acknowledged by Mr. Sanfellipo in a letter dated that same day to Mr. Melody wherein Mr. Sanfellipo further explained that the "final paperwork" on the matter would "be prepared upon determination of the location, and successful negotiation of acceptable terms."
16. At the conclusion of their April 2, 1993 meeting, Messrs. Melody and Sanfellipo agreed that Mr. Sanfellipo would assist Mr. Melody in locating a site for his Cottman Center. They thereafter again met on April 7, 1993 and, together with one of Cottman's Operations Managers, Mark DiMuzio, travelled to a number of different locations in southern Orange County, California for purposes of finding a suitable location for the opening of Mr. Melody's Cottman Center.
17. It was Cottman's understanding that California law required that ten business days elapse between the time that a prospective franchisee receives a franchise offering circular and the time that funds are tendered toward the purchase of a franchise. For this reason and because Cottman had some concern that Mr. Sanfellipo may have accepted payment for the license from Mr. Melody before the expiration of that ten-day period, Mr. Sanfellipo returned the monies to Mr. Melody via correspondence dated April 5, 1993 with the proviso that if Mr. Melody should again decide to proceed with the purchase of his Cottman license, he would accept payment from Mr. Melody after April 5th.
18. In or about March-April, 1993, Joseph Sanfellipo himself owned several Cottman licenses/franchises in Southern California and it was one of these licenses which he sold to Lee Melody. At or about that same time, Mr. Sanfellipo also held certain rights *664 to and interest in, a new autoplex center located in Alisa Viejo, California.
19. One of the locations visited by Messrs. Melody, Sanfellipo and DiMuzio on April 7, 1993 was the Alisa Viejo auto complex in which Mr. Sanfellipo had an interest and it was the consensus of all three that the Alisa Viejo site would be a good location for Melody's franchise. On April 9, 1993, Mr. Melody met with one Rich Julian, the individual from whom he would be subleasing the Alisa Viejo site and gave him a deposit on the sublease.
20. On April 13, 1993, Eileen Burke, a Legal Assistant with Cottman Transmission Systems sent, via overnight mail, a copy of the License Agreement which it was expected that Lee Melody would sign when he purchased the Alisa Viejo franchise. Mr. Melody received and executed a receipt indicating that he had received the said license agreement on April 14, 1993.
21. Lee Melody had the uniform franchise offering circular and the license agreement reviewed by his attorney, William Tucker.
22. As a general rule, because of the confidential nature of the information provided at its three-week training school, Cottman permits only those individuals who have entered into a Cottman license agreement to attend its training school.
23. On April 18, 1993, Lee Melody travelled to Fort Washington, Pennsylvania to attend the Cottman training school which began the following day. As of that date, however, Mr. Melody had not yet signed a license agreement and it was therefore understood that he would be permitted to attend the training sessions as an "employee" of Joseph Sanfellipo. Accordingly, on April 19, 1993, Lee Melody executed an agreement whereby he agreed to, among other things, protect and preserve the confidential information communicated to or acquired by him in the course of the training sessions.
24. On April 27, 1993, Lee Melody once again tendered a check for $22,500 to Joseph Sanfellipo representing payment in full for the Cottman license for the Alisa Viejo site.
25. Donna Melody attended the final week of the Cottman training school session that had commenced on April 19, 1993.
26. On May 6, 1993, Lee Melody entered into a license agreement with Cottman. Immediately prior to his execution of the said document, he was interviewed by Eileen Burke and Todd Leff, Esquire, Cottman's Corporate Counsel, and questioned concerning the circumstances surrounding his purchase of the Cottman license and the representations which had been made to him, if any, by Cottman's representatives. This interview was tape recorded with Mr. Melody's permission and was ostensibly undertaken to ensure that Cottman had complied with all applicable state and federal regulations.
27. Since Mr. Melody had been having some difficulty in obtaining what were in his opinion adequate answers and assurances from Rich Julian with respect to the sublease on the Alisa Viejo site, Mr. Melody requested, and Cottman agreed, to change the location designated in the license agreement from Alisa Viejo, California to Orange County, California.
28. Like all of Cottman's license agreements, the license agreement which Mr. Melody entered into with Cottman on May 6, 1993 contained, inter alia, a clause dictating that any legal proceedings arising thereunder would be governed by the law of Pennsylvania and would be adjudicated in either the Courts of Common Pleas of Philadelphia or Montgomery County or the U.S. District Court for the Eastern District of Pennsylvania. The said license agreement also included a covenant not to compete and an acknowledgment that the telephone numbers and telephone directory listings for the Cottman center were the property of Cottman. Appendix "C" to the license agreement reaffirmed and reiterated the telephone acknowledgement and provided several blank spaces where the actual telephone numbers for the individual Cottman centers were to be specifically designated.
29. Since Lee Melody did not yet know the actual location or have the telephone numbers for his Cottman center at the time he executed the license agreement and Appendix "C" thereto, the address and telephone *665 number portion of the appendix was left blank. Mr. Melody agreed that those portions of Appendix "C" could be completed once he had that information.
30. Approximately one week later, Mr. Melody discovered that he would not be able to sublease the Alisa Viejo site or the equipment at that site. He so notified Cottman and indicated that he would be looking at other locations in hopes of quickly finding one at which to open. At the suggestion of Joseph Sanfellipo and John LoBiondo, another Cottman Operations Manager, that he consider finding an up and running automotive or transmission business which could easily be converted to a Cottman, Mr. Melody found and arranged for the purchase of an operating Motra Transmission Center located in La Habra, California from the Motra franchisee for the total sum of $125,000.
31. On or about July 28, 1993, the May 6, 1993 license agreement was amended to add Donna Melody as an additional operator.
32. Sometime in late August or early September, 1993, Eileen Burke was informed of the address and telephone numbers for the La Habra center and it was at that time that she completed the address and telephone number portions of Appendix "C" to the Melody license agreement.
33. Mr. Melody closed on the purchase of the La Habra business on August 20, 1993 and re-opened the following day as a Cottman Transmission Center. Essentially, the $125,000 purchase price included $22,000 for inventory, $30,000 for furniture, fixtures and equipment, $50,000 for a covenant not to compete, and $23,000 for the business's customer list, goodwill, supplier list, information base, business telephone and fax numbers, and its Yellow Pages and local PennySaver advertising contracts.
34. As of the Melodys' August, 1993 opening, yellow pages advertising for the Motra Transmissions business was in place and was effective in the Pacific Bell Yellow Pages Directories for Orange County North and Orange County Inland and in GTE's Yellow Pages Directories for the Fullerton-Brea and Whittier, California areas. Mr. Melody bought out the existing advertising contracts for these yellow pages directories as part of his purchase of the business. Under the then-existing schedules, the close dates (the dates by which new advertising had to be submitted for inclusion in the updated publications) for the Orange County North, Orange County Inland, Whittier and Fullerton-Brea directories were July 22, July 23, and December, 1993 respectively with respective issue dates of November, 1993 for the North and Inland books and May and April, 1994 for the Whittier and Fullerton-Brea books. Accordingly at the present time, all of these directories are still in circulation with Cottman advertising in place.
35. Pursuant to Paragraph 9 of the license agreement, Cottman franchisees pay to Cottman the sum of $550.00 per week as a continuing advertising fee. Cottman has its own in-house advertising agency, Ross Advertising, which handles the development and placement of the advertising for all Cottman centers nationwide.
36. As a general rule, Ross Advertising develops copy and graphics and does the layout of Cottman advertising for all media, including print (newspapers, magazines, etc.), broadcast (radio and television), coupons and direct mail pieces, and yellow pages and telephone directories. Ross endeavors to place advertisements on behalf of each center every week using the Cottman name, logo and marks and is responsible for overseeing the placement and content of all Cottman ads. Ross also generally puts together a package of advertising for "Grand Openings" of new Cottman centers.
37. Ross began advertising for the La Habra Cottman immediately upon its opening by the Melodys in late August, 1993. Specifically, Ross developed a direct mail coupon to be included in a "val-pak" mailing in the La Habra area and submitted a number of sample ads to Lee Melody for his selection and inclusion in the local PennySaver. Ross likewise assisted Mr. Melody in preparing Yellow Pages advertising to replace the existing advertising which appeared under the name "Motra Transmissions." Specifically, Ross sent Mr. Melody samples of advertisements to which he made some modifications. Eventually, Yellow Pages advertising *666 was placed under Cottman's name and marks for the Pacific Bell Orange County North and Orange County Inland and for GTE's Whittier and Fullerton-Brea directories. These advertisements are virtually identical in terms of copy points, appearance and use of marks to other advertisements that Cottman places in telephone directories around the country.
38. The telephone numbers of the individual Cottman centers are included on every piece of advertising and all promotional items which Cottman/Ross Advertising develops and produces for its licensees.
39. Because Lee Melody paid directly for some of the advertising and the yellow pages contracts himself, he was given certain credits against the $550 per week advertising fees which he had contracted to pay to Cottman under the May 6, 1993 license agreement.
40. Inasmuch as Lee Melody purchased the telephone numbers for the La Habra Motra Transmissions shop as part of his purchase of that business, Cottman undertook little or no action on Melody's behalf to secure telephone numbers for his Cottman center.
41. In addition to the weekly advertising fees, the license agreement, at paragraph 8 provides that the licensee/Cottman center operator will pay weekly a continuing license fee to Cottman equal to seven and one-half percent of the gross business transacted by the center. Cottman further requires that the continuing license fees be calculated based upon the gross business transacted during the preceding week and that they be remitted together with a report showing the computation thereof and the repair orders upon which the computation is based.
42. As part of his Cottman training, Mr. Melody was taught how to do a "breakeven" analysis in order that he might be aware of how much money would be required to keep his Cottman center operating and how much business had to be generated to accomplish this objective. In addition, the Cottman Training School instructors represented that to be successful, it was necessary for each center to keep its parts costs to 14%, its labor costs to 17% and its supplies costs to 3% of its operating expenditures. Cottman further represented at its training school that the geographical location of the center did not matter and that so long as those figures were met, the franchise would be profitable.
43. The Motra franchise which had operated out of the identical location as the Melodys' Cottman center had consistently had parts costs of 24% with the result that the owner/operator of the Motra shop was consistently either breaking even or turning only a slight profit.
44. Mr. Melody was unable to keep his parts and labor costs at the levels recommended by Cottman. His parts costs consistently averaged between 19 and 25% while his labor costs averaged nearly 32%. He likewise found that the taxes and workmen's compensation insurance rates were over and above what had been calculated in his initial break-even analysis.
45. Within two months of opening the La Habra center, the Melodys were experiencing a financial shortfall in that they were continuing to put money into the business but were unable to generate any profits such as would enable them to take money out. In October, 1993, Michael Ambrose, Cottman's President, invited Lee Melody to return to the Cottman home office in Fort Washington for additional assistance and a more individualized analysis of his cash flow problems. Mr. Ambrose, however, did not offer to pay the air fare for Mr. Melody's trip to Pennsylvania and, for this reason and because he didn't want to leave his business, Mr. Melody declined the invitation.
46. On or about October 26, 1993, Cottman Operations Coordinator, Lennie Hassinger, sent to Lee Melody a list of six center manager candidates who were available for contact, only one of whom was in the Southern California area. None of the other candidates, would relocate to Southern California unless Mr. Melody would agree to pay his moving and relocation expenses.
47. In the opinion of the Cottman home office, the Melodys were experiencing financial difficulties because they were paying far more than was necessary, even by California *667 standards, for wages and advertising and because their manager was not capitalizing on sales leads.
48. As of mid-December, 1993, the Melodys' ceased submitting their weekly gross business reports and payments of the license and advertising fees to Cottman.
49. On January 30, 1994, Lee Melody wrote to Michael Ambrose and enclosed a statement of his profits and losses for the 19 weeks that the La Habra center had been in operation. That statement showed a net loss over that time period of $24,763.71, which loss was, according to Mr. Melody, attributable to the fact that the Cottman "system" of doing business could not work in Orange County, California where the labor, insurance and other costs were far greater what they were in other parts of the country.
50. In response to this January 30, 1994 letter, Mr. Ambrose again wrote to Mr. Melody on February 1, 1994 and invited him out to the home office where he would have access to the information, resources and personnel necessary to help address the problems which his center was experiencing. In addition, Mr. Ambrose indicated a willingness to "work something out" if Mr. Melody needed help in obtaining a plane ticket. Nevertheless, Mr. Melody again declined the invitation on the grounds that such a visit would be too stressful and he didn't wish to leave his business.
51. On February 25, 1994, Cottman's general counsel, Todd P. Leff, Esquire, wrote to Lee and Donna Melody and advised them that they were in breach of the Cottman license agreement by virtue of their failure to submit weekly reports and pay the license and advertising fees for the preceding six-week period. Mr. Leff's letter concluded by requesting that the Melodys begin to comply with the provisions of the licensing contract and submit the past-due weekly reports and call him in order that a dialogue for amicably resolving the situation and/or a meeting date might be established.
52. Several days after the Melodys received Mr. Leff's 2/25/94 letter, Lou Smith, one of Cottman's credit managers visited the La Habra center and the Melodys gave him the six missing weekly reports. In addition, at or around that same time, Mr. Melody telephoned Mr. Leff, at which time Mr. Leff suggested that the Melodys could: (1) sell their business as a Cottman franchise and walk away; (2) turn their center into an independent transmission business and run it as they saw fit; or (3) allow Cottman to install a management group to run the center for them. Insofar as the Melodys desired to be compensated for the losses which they had sustained as a result of purchasing the Cottman franchise, none of these three options were agreeable to them.
53. Several days after his conversation with Mr. Leff, Lee Melody decided to give up his Cottman franchise and sue for rescission of the licensing contract. On March 2, 1994, Lee and Donna Melody filed a complaint for rescission and damages for violations of the California Franchise Investment Law and the California Seller-Assisted Marketing Plan Act, fraud, negligence and negligent misrepresentation in the Orange County, California Superior Court. The complaint was served the following day on the California Commissioner of Corporations and was served by mail on Cottman Transmission Systems on March 24, 1994.
54. On March 9, 1994, Todd Leff sent, via airborne express and first class mail, correspondence formally notifying Lee and Donna Melody that Cottman was terminating the license agreement and demanding that they "immediately return to Cottman all materials relating to Cottman which are in your possession including ... all Cottman signs, posters, repair orders, and Cottman's Operators Manuals" and reminding them that under paragraphs 19 and 20 of the license agreement, they were prohibited from operating a competing transmission business at the La Habra location, from representing that they were in any way associated with, approved or licensed by Cottman and from using any of Cottman's names, marks, signs or other advertising associated with Cottman. That same date, Cottman filed a complaint in the Court of Common Pleas of Montgomery County, Pennsylvania against Lee and Donna Melody for breach of contract and a declaratory judgment that the May 6, 1993 license *668 agreement was valid and that Cottman had fulfilled all of its obligations thereunder.
55. On or about the same date that he filed the California lawsuit, Lee Melody took down all of the exterior and interior signs depicting the La Habra center as a Cottman Transmission center, discontinued use of the Cottman repair order forms, painted over the name "Cottman" on the parking spaces and put up new signs indicating that he had changed the name of his business to "The Transmission Center." He continued to use the same telephone numbers which he had used as a Cottman licensee.
56. On March 10, 1994, at the request of Cottman representatives Todd Leff and Mark DiMuzio, a private investigator by the name of Donna Noonon telephoned the La Habra center to make an appointment for a preventative maintenance check on her automobile's transmission. Lee Melody answered the telephone by saying "The Transmission Center. May I help you?"
57. On March 11, 1994, private investigator Noonon visited the La Habra center and observed a sign on the front of the marquis which read "The Transmission Center," with the "The" and "Center" written in blue lettering and the word "Transmission" written in red lettering. A smaller sign matching this one was located on the front wall of the business centered above the front door. The investigator met Lee Melody, wearing a blue jacket with a space where a patch had been removed and he handed her a Cottman Transmission Center business card. On the wall behind the front counter was a framed business license made out to Cottman Transmission and Ms. Noonon observed Mr. Melody write out a check with the name "Cottman" on it to Caltrans, a parts company, and saw an employee named Joe wearing a blue uniform with a Cottman patch on it. Mr. Melody prepared an estimate on the computer using a booklet which had the Cottman name on it and the investigator also saw several signs which appeared to have been taken off the front of the building lying down in the work area against the wall. Although the name "Cottman" was not seen, the capital letter "C" and the red transmission logo were observed. Finally, Mr. Melody made out a service agreement which read "The Transmission Center" and when the investigator inquired whether the business was still operating as Cottman Transmission, he responded simply "no, not anymore."
58. As of March 9, 1994, the advertisement for the La Habra center in the local Pennysaver newspaper still read "Cottman Transmission." As of March 16, 1994, the advertisement reflected that it was for "The Transmission Center."
59. Mr. Melody did not receive any specific instructions from Cottman regarding what to do with the Cottman signs, forms and manuals. Rather than return these items directly to Cottman, he stored the signs upside down and backwards behind white masonite in the center and removed the Cottman business forms and manuals to his garage at home.
60. On March 29, 1994, Cottman filed an amended complaint and petition for temporary restraining order and preliminary injunction against the Melodys in the Montgomery County Court seeking to enjoin them from, among other things, using the same telephone numbers at The Transmission Center as they had used when the center was a Cottman, using or infringing upon Cottman's trademarks in their advertising, business cards and forms and signs, and from using any of Cottman's propriety manuals and confidential information in their business. Following a brief hearing, Judge Salus of the Montgomery County Common Pleas Court granted the request for a temporary restraining order and set the matter down for a hearing on the request for a preliminary injunction for April 5, 1994.
61. Although the Melodys sought to remove the Montgomery County case to this Court and to quash the temporary restraining order on March 29, 1994, the initial Notice of Removal was technically deficient and this Court therefore did not have the requisite jurisdiction to act on that date. Although the case was properly removed to this Court the following day, the temporary restraining order issued by Judge Salus was not disturbed.
*669 62. On March 30, 1994, Judge Watson of the Orange County, California Superior Court issued a temporary restraining order enjoining Cottman Transmission Systems, Inc. and Pacific Bell Company from terminating or attempting to force the termination of or interfere with the maintenance of the telephone numbers for the La Habra center. Full hearing on the Melodys' TRO application in the California court was set down for April 13, 1994.
63. It was not until April 7, 1994 in the course of the hearings before this Court that Mr. Melody returned to Cottman its operations manuals.
64. At present, the Melodys have yet to return to Cottman all of the signs, warranty forms, repair orders, order books and any other remaining materials which they utilized in operating a Cottman Transmission Center although they are willing to do so.
65. Under their lease agreement with Karahadian Ranches, Inc., the owner of the autoplex where The Transmission Center is located, the Melodys can apply for permission to use the premises for something other than a transmission repair business which permission shall not be unreasonably withheld provided that the new use would not interfere with the business of the other specialty tenants in the autoplex. The lease further prohibits the Melodys as lessees from performing lube and oil changes except that they have the right to change transmission fluids and related drive train greases and oils and perform transmission and drive train lubrications. In addition, paragraph 4.3 of the lease provides, in pertinent part:
Tenant is prohibited from paint and body work, from performing any smog certification tests or repairs, selling or installing tires, selling or installing mufflers or exhaust components, or performing auto detailing or washing services, or specializing in the repair or servicing of a particular brand of automobile (e.g. Mercedes Benz) as evidenced by Tenant receiving more than twenty-five (25%) of their gross revenues from such work ...
66. At present, the Melodys are continuing to operate The Transmission Center at the same location as their Cottman Center. They have not requested permission from their landlord to operate any other business at this location.
67. At present, The Transmission Center utilizes the identical telephone numbers which were used by both the Cottman Transmission Center and the Motra Transmission Center.
68. Although the advertisement which The Transmission Center runs each week in the PennySaver is not identical to the advertisement which ran in that publication when the Melodys operated a Cottman Transmission center, the same telephone numbers are advertised as is the phrase "Free 21-point Courtesy Check," which Cottman uses in almost all of its advertising.
69. There is no evidence that the "Free 21-point Courtesy Check" phrase is copyrighted or that it is a registered mark but Cottmans are the only transmission repair centers which offer the free 21 point courtesy check as part of its regular service program.
70. The advertisement which Lee Melody recently submitted for publication in the May, 1994 GTE Whittier telephone directory is almost identical to the advertisement which ran in the 1993 directory except that the name of the La Habra center is now designated as "The Transmission Center of La Habra (formerly Cottman)" and the indication that Cottman warranties will be honored coast to coast has been deleted. The same telephone numbers are reflected in the updated advertisement.
71. It is a fairly simple procedure to obtain new business telephone numbers from the telephone companies and, as a general rule, when the telephone numbers have been changed, the obligation to pay for the telephone directory advertising for the old numbers is discharged.
72. There is a strong likelihood that consumers and other members of the general public will confuse Cottman Transmissions with the Melody's Transmission Center when they see advertising which is similar in appearance to that employed when the center was a Cottman particularly when it operates out of the same location with the same telephone *670 numbers as the former Cottman center and this confusion has the potential to cause irreparable harm to Cottman's name and national reputation and to other Cottman franchisees both in the immediate vicinity of Southern California and nationwide in the event that warranty claims were to develop as the result of The Transmission Center's work. Cottman is also threatened with immediate irreparable harm in that the appearance of a "former Cottman" transmission center competing and using indicia of its previous association with Cottman, including the telephone numbers, in the Orange County area could well deter potential new franchisees in that area from buying a Cottman license.
73. Although the Melodys could also suffer harm and monetary damages in the event that the telephone numbers to The Transmission Center were to be changed, the harm which they stand to incur is outweighed by the potential for harm to Cottman.

DISCUSSION
Although the right upon which actions for injunctive relief is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions. Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3rd Cir.1989) quoting System Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1141 (3rd Cir.1977). The grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances. Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3rd Cir.1988). At the trial level, the party seeking a preliminary injunction bears the burden of convincing the court that: (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest. Campbell Soup Co. v. Conagra, Inc., 977 F.2d 86, 90-91 (3rd Cir.1992); ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3rd Cir.1987). In this regard, it has been held that a showing of a risk of mere irreparable harm is not enough. A plaintiff has the burden of proving a "clear showing of immediate irreparable (not merely serious or substantial) injury of a peculiar nature so that compensation in money cannot atone for it." Campbell Soup, at 91-92; ECRI, at 226. See Also: In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1145 (3rd Cir.1982).
We additionally at the outset observe that this court has both subject matter and diversity jurisdiction over this case by virtue of the choice of law/choice of forum clause contained in the license agreement, the trademark infringement/Lanham Act claims set forth in the plaintiff's complaint and the fact that the plaintiff is a Pennsylvania resident while the defendants are residents of California. Accordingly, we apply the substantive law of Pennsylvania to all non-federal causes of action. See, e.g.: Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Griggs v. BIC Corp., 981 F.2d 1429, 1431 (3rd Cir.1992). This fact notwithstanding, Defendants argue that California law is properly applied because, as California residents, they are entitled to the protections afforded by the laws of that state which evince a strong public policy against restrictions on competition.
The laws of Pennsylvania and California are substantially in agreement insofar as the enforcement of choice of forum and choice of law clauses are concerned and there is therefore no need to engage in a lengthy analysis of the choice of law principles of the states involved. See, e.g.: Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-1022, 85 L.Ed. 1477 (1941). To be sure, a Pennsylvania court would conclude that a forum selection clause is enforceable in the absence of a compelling, countervailing reason such as would arise in the event that the person challenging enforcement can show that operation of the clause will impose unreasonable restraints or burdens or that it was not entered into freely. Instrumentation Associates, Inc. v. Madsen Electronics (Canada), Inc., 859 F.2d 4, 7-8 (3rd Cir.1988); Pennsylvania House, Inc. v. Barrett, 760 F.Supp. *671 439, 444 (M.D.Pa.1991). The California courts, in turn, generally adhere to the view-point that "contracting parties may expressly consent to litigate issues regarding the contract in a particular forum and this choice will normally be binding unless it is unfair or unreasonable." Zenger-Miller, Inc. v. Training Team, GMBH, 757 F.Supp. 1062, 1069 (N.D.Cal.1991).
Similarly, in Pennsylvania, a choice of law provision in a contract is given effect so long as the transaction bears a reasonable relationship to the state whose law is governing. Novus Franchising, Inc. v. Taylor, 795 F.Supp. 122, 126 (M.D.Pa.1992). Generally speaking, under California choice of law principles, a provision in a contract dictating the law by which the contract should be interpreted is given deference. However, California law will not give force to a choice of law clause where the contract contains a provision which violates a strong California public policy. Scott v. Snelling and Snelling, Inc., 732 F.Supp. 1034, 1039 (N.D.Cal.1990).
By way of its motion for preliminary injunctive relief in the case at bar, the plaintiff is seeking to enforce Paragraphs 6, 9, 11, 14, 15, 19, 20 and 27 of its licensing agreement with the Melodys, together with the appendices annexed thereto and made a part thereof. Those paragraphs and appendices concern respectively, (1) the loan of the Cottman operator's manuals, the use of Cottman's names, marks, trade secrets and advertising, the center's telephone numbers and signs and the immediate return and discontinuance of the use thereof by the licensee upon termination of the license agreement; (2) a covenant not to compete following termination of the license agreement; and (3) the choice of law/forum selection provision whereby the Melodys agreed that any and all claims arising out of the said agreement would be decided by either the U.S. District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Philadelphia or Montgomery County, Pennsylvania, that Pennsylvania law would govern, and that they (the Melodys) would submit to the jurisdiction of those courts. Again, the plaintiff premises its claims for relief under those clauses upon the theories, inter alia, of breach of contract, unfair competition, tortious interference with business and prospective business relationships and for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1051-1127.
The Melodys, by way of their responsive pleadings and the evidence produced at the hearings, do not appear to be challenging the application of Pennsylvania law to paragraphs 6, 9, 11, 15 and 19 or to Appendix A and B of the license agreement. Rather, it appears to be their position that because paragraphs 14 and 20 and Appendix C contravene California public policy, they cannot be enforced by this Court. Accordingly, we first analyze the claims which plaintiff brings pursuant to paragraphs 6, 9, 11, 15 and 19 and to their accompanying appendices in light of the preliminary injunction standards enunciated above.
In so doing and in reviewing the record developed in this matter over the three days of hearings, we must conclude that the plaintiff has met its burden of proving that it has and will immediately suffer serious irreparable harm, which harm outweighs that which is apt to be suffered by these defendants if they are not promptly preliminarily enjoined from any further use of the Cottman name, marks, telephone numbers or proprietary materials and from holding themselves out as being or at one time having been associated with Cottman Transmissions Systems. In this regard, Cottman's company president, Michael Ambrose, testified that in his more than twenty years of experience with the company, it has been very harmful to the company to have previous franchisees continue to hold themselves out as Cottman licensees. Mr. Ambrose further explained that this harm is incurred as a result of the confusion experienced by customers who are expecting to have repair work done by Cottman standards and quality. When those customers don't receive that expected quality, they lose faith and confidence in the Cottman name. In addition, these customers expect to receive what they thought was a Cottman warranty and to have that warranty honored by the Cottman system. What's more, in Ambrose' experience, it becomes difficult to sell new franchises in *672 the area of a former licensee who still holds himself out as a Cottman as a result of the negative comments that the former licensee can be expected to make as a result of his disenchantment with the Cottman system.
Cottman also presented the testimony of Harry Kalish, of Ross Advertising, that there is a strong likelihood that the general public is confused when it sees advertising for competing businesses which is substantially similar in terms of placement, copy points and content, particularly when they see one business advertised one week and another, competing business operating out of the same location advertised the following week. In this case, customers are apt to wonder whether "The Transmission Center" is still a Cottman or not and whether their warranties are still effective. Although Lee Melody testified that he has taken down his Cottman signs, discontinued use of his Cottman repair order and other business forms and has now returned to Cottman its manuals and other proprietary materials, he did not agree that the advertising which he is now placing in the weekly PennySaver newspaper or that the changes which he recently submitted for the Whittier Yellow Pages directory was substantially similar to that placed when he was operating as a Cottman. Nevertheless, after comparing the Cottman advertising, for both Mr. Melody's center and for that placed by Cottman on behalf of its franchisees in other parts of the country, this court finds that the advertising now being utilized by The Transmission Center is very close in terms of copy points and layout to that placed by Cottman and that it therefore has great potential to confuse members of the general public. Clearly this evidence sufficiently demonstrates that Cottman has suffered and will continue to immediately suffer irreparable harm for which the only adequate remedy is an order enjoining the Melodys from the continued use of Cottman's name, marks, advertising, signs, and operator's and other proprietary manuals and materials, that the potential harm to be suffered by Cottman exceeds that which may be suffered by the Melodys and that the issuance of a preliminary injunction would be in the public interest.
We likewise find that Cottman has satisfied its burden of proving that it is likely to prevail on the merits of at least its breach of contract, unfair competition and trademark infringement claims arising out of these provisions at trial. Under Pennsylvania law, a cause of action for breach of contract must be established by showing the existence of a contract to which the plaintiff and defendant(s) were parties, the essential terms of that contract, a breach of the duty imposed by the contract and damages as a result. Electron Energy Corp. v. Short, 408 Pa.Super. 563, 597 A.2d 175 (1991), aff'd w/o opinion, 533 Pa. 66, 618 A.2d 395 (1993); General State Authority v. Coleman Cable & Wire Co., 27 Pa.Cmwlth. 385, 365 A.2d 1347 (1976).
Unfair competition, in turn, is a common law cause of action which has been defined as the passing off by a defendant of his goods or services as those of plaintiff by virtue of substantial similarity between the two leading to confusion on the part of potential customers. Schmid Laboratories v. Youngs Drug Products Corp., 482 F.Supp. 14, 21 (D.N.J.1979). The issue of trademark infringement is but one aspect of the broader field of unfair competition and, since trademark infringement is a narrower concept, any finding that it has occurred will, by necessity, support an additional finding that the defendant is also guilty of unfair competition. Smithkline Beckman Corp. v. Pennex Products Co., 605 F.Supp. 746, 749 (E.D.Pa. 1985). The reverse, however, is not true and evidence may therefore be adduced to show that the defendant has simulated an aspect of plaintiff's product sufficient to deceive the consumer without a finding that such action has infringed a trademark. Id. The Lanham Act was designed, in large part, to curb deceptive and misleading uses of trademarks and to provide protection for not only business but also the general public from the use of false trade descriptions and unfair competition. Selchow & Righter Co. v. Decipher, Inc., 598 F.Supp. 1489, 1495 (E.D.Va.1984). Pursuant to § 43(a) of the Act, a trademark and trade dress are protectable if they are inherently distinctive or have acquired a secondary meaning to the general buying public. *673 Id. To prevail on a trademark infringement claim then, it is generally incumbent upon a plaintiff to demonstrate that the defendant's use of its marks was unauthorized and likely to cause confusion concerning the origin of the goods or services. S & R Corp. v. Jiffy Lube International, Inc., 968 F.2d 371, 375 (3rd Cir.1992), citing Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 192 (3rd Cir.1990); Selchow & Righter, supra, at 1495.
In this case, as noted above in our Findings of Fact, Cottman has demonstrated (1) that it entered into a license agreement, as amended, with Lee and Donna Melody effective May 6, 1993 which provided for the payment of license and advertising fees in exchange for the issuance of a license to use the Cottman system of operations and advertising, its trademarks, signs, logos and proprietary materials; (2) that the Melodys breached this agreement by failing to pay the licensing and advertising fees and by failing to submit the weekly gross business reports; (3) that Cottman notified the Melodys on or about March 9, 1994 that its license was terminated; (4) that notwithstanding this termination the Melodys failed to return to Cottman its signs, manuals and other proprietary materials (until April 7, 1994 when, at the hearing before the undersigned, Mr. Melody returned the manuals), continued to operate a competing Transmission business at the same location using some of the same materials (i.e. business cards, proprietor's license, etc.) bearing the Cottman name, mark and logo, used the same telephone numbers and continued to place advertisements which were substantially similar to that placed by Cottman. From this evidence, we easily find that the plaintiff has shown that it is likely to succeed on the merits of its breach of contract, trademark and unfair competition claims relative to paragraphs 6, 9, 11, 15 and 19 and the relevant appendices to its license agreement with the defendants.
Turning next to Cottman's claims under paragraphs 14 and 20 and Appendix C of its license agreement with the Melodys concerning the termination of the telephone numbers and the covenant not to compete, we again find from the evidence recited above that the plaintiff has adequately demonstrated breach of those contractual provisions as well as the likelihood that it stands to suffer immediate irreparable harm if equitable relief is not granted. Moreover, neither the research supplied by defense counsel nor our own independent research has disclosed any authority whatsoever which could be construed to support the defendants' argument that the enforcement of paragraph 14 of the parties' license agreement rendering the La Habra center's telephone numbers the property of Cottman would violate California public policy. So saying, we believe that the plaintiff has sufficiently established that it is likely to succeed on the merits of its claim with regard to this paragraph as well and, in view of the relative ease with which Mr. Melody can procure new telephone numbers for his transmission center business, the harm which he would potentially suffer is clearly outweighed by the potential damage to Cottman's name, reputation and good will and the risk of public confusion to be engendered by the continued use of the same phone numbers in The Transmission Center's advertising. Accordingly, we know of no reason to deny Cottman's request to direct that the phone numbers be terminated.
We are unable to reach the same result, however, with regard to the enforcement of paragraph 20 of the agreement, the covenant not to compete. In this regard, it appears clear to this court that contractual provisions prohibiting former employees or franchisees from competing against their former employers violate a clearly enunciated public policy of the State of California. Great Frame Up Systems, Inc. v. Jazayeri Enterprises, Inc., 789 F.Supp. 253, 256 (N.D.Ill.1992); Scott v. Snelling & Snelling, Inc., supra, at 1039-1040, both citing, inter alia, Cal.Bus. & Prof.Code, § 16600. Accordingly, while we have no difficulty in concluding that Cottman has shown the first three elements needed for an injunction (the threat of immediate irreparable harm which outweighs that which is threatened to the defendants and that the public interest would be served by the grant of injunctive relief), it is not clear to this court that the plaintiff would likely succeed on the merits of its request to enforce the covenant not to compete. *674 For this reason, we cannot grant preliminary injunctive relief on the basis of this covenant at this time.
The following legal conclusions are now entered.

CONCLUSIONS OF LAW
1. This court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332.
2. The defendants, Lee and Donna Melody have breached and continue to breach the license agreement which they entered into with Cottman Transmissions Systems, Inc. on or about May 6, 1993 by failing to pay the licensing and advertising fees provided for in paragraphs 8 and 9 and by continuing to use Cottman's trademarks, logos, name and telephone numbers in the conduct of their business and in their advertising and by operating a competing transmission business at the same location as their Cottman franchise at 441 E. Imperial Highway in La Habra, California.
3. There exists under California law a strong public policy disfavoring the use of post-termination covenants against competition.
4. The plaintiff has suffered and continues to suffer irreparable harm as the result of the defendants' continued breach of the provisions of the May 6, 1993 license agreement, which harm cannot be properly recompensed by the payment of monetary damages.
5. The defendants could potentially lose some business and are therefore likely to suffer some harm should the telephone numbers to their transmission business be terminated/changed.
6. The irreparable harm which Cottman stands to experience if the defendants are not enjoined from using their trademarks, name, logos, telephone numbers, advertising and other proprietary materials exceeds the potential harm to be suffered by the Melodys if they are so enjoined.
7. The plaintiff has proven to this Court that it is likely to succeed at trial on the merits of all of its claims with the exception of its right to enforce the covenant not to compete.
8. The plaintiff has proven to this court that the only adequate remedy available to compensate it for the defendants' ongoing breach and trademark infringement is the issuance of a preliminary injunction against defendants.
An appropriate order follows.

ORDER
AND NOW, this 21st day of April, 1994, upon consideration of Cottman Transmission System, Inc.'s Motion for Preliminary Injunction, Defendant's Response thereto and following three days of hearings in this matter, it is hereby ORDERED that the Motion is GRANTED and Defendants Donna and Lee Melody and all those acting in concert, combination, under authority from, or in agreement with them (including Pacific Bell Telephone Company) are from this date forward preliminarily enjoined from: (1) using any Cottman telephone numbers, including the numbers (714) 992-4024, (714) 992-0644 and (310) 690-1312 and are enjoined to terminate such numbers; (2) infringing upon Cottman's marks by using any Cottman advertisements, signs, forms, manuals or any other marks that are confusingly similar to Cottman's marks or representing themselves in any manner as "formerly Cottman"; (3) using any Cottman proprietary manuals or confidential materials.
IT IS FURTHER ORDERED that the said defendants are DIRECTED to return to Cottman within fifteen (15) days of the entry date of this Order any and all Cottman signs, manuals, forms, and proprietary or confidential materials which they may have in their possession.
IT IS STILL FURTHER ORDERED that Cottman shall arrange to have the cash bond previously posted with the Prothonotary of the Court of Common Pleas of Montgomery County, Pennsylvania transferred to the Clerk of the United States District Court for the Eastern District of Pennsylvania.